**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEBRASKA**

IN RE:

JASON E. PERKINS,

           Debtor.

Case No.  26-40164-BSK

Chapter  12

FIRST INTERSTATE BANK,

           Plaintiff,

vs.

JASON E. PERKINS,

           Defendant.

Adv. Pro. No. _____

**COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT**

Plaintiff, First Interstate Bank (the "Bank"), a creditor in the above-referenced bankruptcy, hereby requests, pursuant to 11 U.S.C. § 523, that the Court enter an order determining that the debt owed by Jason E. Perkins ("Debtor" or "Perkins") to the Bank is not dischargeable in the above-captioned bankruptcy case. In support hereof, the Bank states and alleges as follows:

**PARTIES**

1.     The Bank is a banking corporation organized under the laws of Montana that is registered to do business in Nebraska and is a creditor in the above-referenced Chapter 12 bankruptcy. *See* (Case No. 26-40164-BSK, Doc. 18).

2.      Perkins is the Debtor in the above-referenced case and is an individual residing in Mitchell, Scotts Bluff County, Nebraska.

## JURISDICTION AND VENUE

3.      On February 17, 2026, Debtor filed his Voluntary Petition under Chapter 12 of the Bankruptcy Code (Case No. 26-40164-BSK, Doc. 1).

4.      This Complaint to Determine Nondischargeability of Debt is being timely filed under Fed. R. Bankr. P. 4004(a) because it is being filed not later than 60 days after the date that was first set for Debtor's meeting of creditors under 11 U.S.C. § 341(a), which was March 17, 2026. *See* (Case No. 26-40164-BSK, Doc. 3).

5.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The statutory predicate for the relief sought herein is to 11 U.S.C. § 523(a)(2). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Federal Rules of Bankruptcy Procedure Rule 7001 et seq. govern this adversary proceeding.

## SUMMARY OF CLAIM

6.      The Bank seeks a determination that Debtor violated 11 U.S.C. § 523(a)(2)(B) by obtaining money or an extension, renewal, or refinancing of credit through false statements and representations and materially false statements in writing regarding Debtor's and/or an insider's ownership of collateral.

## FACTUAL ALLEGATIONS RELATED TO CAUSE OF ACTION
### The Loan Transaction

7.      In December of 2022, the Bank, as lender, and Perkins and his business, Perkins Agribusiness, LLC ("Perkins Agribusiness," and collectively, "Borrowers")  as borrowers, entered into an Agricultural Loan Agreement (the "Loan Agreement") dated December 29, 2022, in the

principal amount of two million dollars ($2,000,000.00). A true and correct copy of the Loan

Agreement is attached as **Exhibit A** and incorporated herein by reference.

8.      According to Perkins, Perkins Agribusiness is 100% owned by Perkins. Perkins

was a director, officer, or person in control of Perkins Agribusiness and Perkins Agribusiness is

an insider of Debtor for purposes of § 523(a)(2)(B). *See* 11 U.S.C. § 101(31)(A)(iv).

9.      Pursuant to the Loan Agreement, Borrowers executed and delivered to the Bank a

Promissory Note (the "Note") dated December 29, 2022, in favor of the Bank in the original

principal amount of two million dollars ($2,000,000.00), with interest accruing on such principal

at a variable rate. A true and correct copy of the Note is attached as **Exhibit B** and incorporated

herein by reference.

10.      The original maturity date of the Note was January 5, 2024.

11.      Pursuant to the Loan Agreement, the Note is secured by an Agricultural Security

Agreement (the "Security Agreement"), dated December 29, 2022, between the Bank and

Borrowers. A true and correct copy of the Security Agreement is attached as **Exhibit C** and

incorporated herein by reference.

12.      As set forth in the Security Agreement, Borrowers gave the Bank a security interest

in, among other things, "all farm products" as described therein, including, but not limited to,

livestock, born or unborn, and all equipment to secure the indebtedness under the Note

(collectively, the "Collateral").

13.      The Bank would not have loaned Borrowers $2 million but for Borrowers providing

sufficient Collateral to secure the obligation.

**Perkins' Financial Statements, Borrowing Base Certificates, and the Change In Terms**

**Agreements**

14. The Loan Agreement expressly states that "in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements..."

15. Furthermore, the Loan Agreement states that representations and warranties "shall be continuing in nature, shall be deemed made and redated by Borrower at each time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full or until Agreement shall be terminated..."

16. One of the primary forms of Collateral that Mr. Perkins represented to the Bank that he and or Perkins Agribusiness owned to secure the Loan Agreement and Note was cattle.

17. Prior to and and after to executing the Loan Agreement, Note, and the Security Agreement,  Perkins executed multiple Financial Statements and certified that they were a "true, complete and accurate statement" of his financial condition (the "Financial Statements"). A true and correct copy of at least some of the Financial Statements are attached as **Exhibit D** and incorporated herein by reference.

18. In terms of Perkins' initial representations to the Bank regarding Collateral, on the Financial Statement dated December 19, 2022, Perkins signed and verified that Borrowers owned $724,206.00 worth of "Market Livestock" and $600,000 of "Breeding Stock."

19. It is unknown whether those representations were true and accurate when made, but, as set forth herein, either from the beginning or during the term of the Loan Agreement, Perkins' representations regarding the cattle owned by Borrowers were not true.

20. Throughout the term of the Loan Agreement, Perkins continued to represent in writing to the Bank that Borrowers owned cattle.

21. By way of example, Perkins represented in a Financial Statement dated June 27, 2024, that Borrowers owned $3,396,368.00 in Market Livestock and $1,440,000.00 in Breeding

Stock. Upon information and belief, this Financial Statement contains false statements about Perkins' financial condition and the cattle Borrowers owned.

22.    Ultimately, Perkins represented in his Financial Statement dated April 22, 2025 he owned $1,818,145.00 worth of Market Livestock. This Financial Statement contains false statements about Perkins' financial condition and the cattle Borrowers owned.

23.    The Bank reasonably relied on the statements and representations made by Perkins in the Financial Statements regarding Borrowers' financial condition, including by extending the maturity date of the Note.

24.    In addition to the Financial Statements, Perkins executed and provided the Bank with numerous Borrowing Base Certificates containing false statements in connection with receiving the $2 million loan (the "Borrowing Base Certificates"). A true and correct copy of at least some of the Borrowing Base Certificates is attached as **Exhibit E** and incorporated herein.

25.    By way of example, the Borrowing Base Certificate dated April 21, 2023 represented that the value of Borrowers' "Cattle Hedged" was $1,920,000.00 and the Borrowing Base Certificate dated November 30, 2023 represented that the value of the "Cattle Unhedged" was $2,341,500.00.

26.    Upon information and belief, at least the following Borrowing Base Certificates signed by Perkins and provided to the Bank contained false statements regarding Borrowers' financial condition:

| Date of Certificate | Cattle Unhedged/Hedged | Breeding Livestock |
|---|---|---|
| April 19, 2024 | $3,427,944.00 | $1,440,000.00 |
| May 30, 2024 | $3,260,922.00 | $1,440,000.00 |

| June 27, 2024 | $3,396,368.00 | $1,440,000.00 |
| July 31, 2024 | $3,528,952.00 | $1,440,000.00 |
| August 31, 2024 | $3,248,700.00 | $1,560,000.00 |
| September 30, 2024 | $3,462,000.00 | $1,680,000.00 |
| October 29, 2024 | $1,595,800.00 | $3,744,000.00 |
| December 3, 2024 | $1,604,250.00 | $3,720,000.00 |
| January 3, 2025 | $1,652,109.00 | $3,720,000.00 |
| February 2, 2025 | $1,777,69.00 | $3,720,000.00 |
| April 7, 2025 | $1,689,220.00 | $3,640,000.00 |

27.     The Bank reasonably relied on the statements and representations made by Perkins in the Borrowing Base Certificates regarding Borrowers' financial condition.

28.     In reliance on the statements and representations made by Perkins in the Financial Statements and Borrowing Base Certificates, the Bank entered into at least five (5) Change In Terms Agreements with Borrowers regarding the Loan Agreement and Note.

29.     The first Change in Terms Agreement was executed on January 29, 2024 and the effect of the agreement, among other things, was to extend the maturity date of the Note from January 5, 2024 to April 5, 2024. Subsequent Change in Terms Agreements extended the maturity date from: April 5, 2024 to July 4, 2024; July 4, 2024 to October 4, 2024; and October 4, 2024 to February 4, 2025.

30.     The most recent Change In Terms Agreement, dated March 26, 2025 (the "March 2025 Change in Terms Agreement"), changed the "maturity date" on the Note from February 4, 2025, to May 4, 2025 (the "Maturity Date"). A true and correct copy of the March 2025 Change in Terms Agreement is attached as **Exhibit F** and incorporated herein by reference.

31.     The Bank would not have executed the Change In Terms Agreements with Borrowers nor would it have extended the Maturity Date had it known or had reason to believe Perkins was providing false statements and false representations in the Financial Statements and Borrowing Base Certificates regarding his financial condition, including regarding the Collateral owned by Borrowers.

32.     Pursuant to the March 2025 Change in Terms Agreement, the entire amount due and owing to the Bank under the Note was due no later than May 4, 2025.

33.     In addition to the Financial Statements and Borrowing Base Certificates, throughout at least 2024 and the beginning of 2025, Perkins made other false representations to the Bank that he and/or Perkins Agribusiness still owned cattle.

34.     Specifically, Perkins told a Bank representative he had an agreement with the owner of certain real property to keep his cattle located on that property.

35.     In or about the Spring of 2025, the Bank conducted a collateral inspection.

36.     During the collateral inspection, Leland Poppe ("Poppe"), a representative of the Bank, visited the real property identified by Perkins and saw there were cattle on the property. Based on Perkins' representations, including both verbally and on the Financial Statements and Borrowing Base Certificates, Poppe understood the cattle to be owned by Borrowers.

37.     After the collateral inspection, Poppe called the owner of the real property to ask about the cattle and his relationship with Perkins. The property owner informed Poppe that Perkins and or Perkins Agribusiness had no ownership interest in the cattle and there was no business relationship between himself and Perkins or Perkins Agribusiness.

38.     Thereafter, Poppe called Perkins to ask about the cattle and his relationship with the property owner. During the phone call, Perkins admitted that he was not the owner of the cattle

on that property, that he no longer owned any cattle, and that Borrowers had previously sold all their cattle, without paying the Bank any of the proceeds from such sales. This was the first time the Bank learned Borrowers no longer owned any cattle.

39.     Prior to learning that Borrowers no longer owned any cattle, the Bank reasonably relied on all of the oral and written false statements and representations made by Perkins about the ownership of cattle, his Collateral for the Note, and his financial condition.

40.     Upon information and belief, at some time after executing the Loan Agreement, Note, and the Security Agreement, Perkins sold, disposed, or otherwise transferred ownership of the cattle to another party. It is unknown when Perkins ceased owning cattle. However, at the March 17, 2026 meeting of creditors, Perkins testified that that the last time he and/or Perkins Agribusiness owned cattle was in 2024.

### Events of Default

41.     The Loan Agreement, Note, and Security Agreement set forth events that constitute an "Event of Default."

42.     After the occurrence of the May 4, 2025 Maturity Date, Borrowers failed to pay the Bank, which constituted an "Event of Default" under the Loan Agreement and Note.

43.     In addition to Borrowers' failure to pay their indebtedness to the Bank, the Bank discovered at least the following additional Events of Default under the Loan Agreement, Security Agreement, and Note:

> a.     Prior to the Maturity Date, Borrowers sold or otherwise disposed of Collateral, including but not limited to cattle, without delivering the proceeds of the sale of such Collateral to the Bank;

b.      Borrowers breached their representations and warranties to the Bank related to holding good and marketable title to their Collateral, including cattle; and

c.      Borrowers made false statements to the Bank regarding their Collateral, including statements that are false and misleading regarding the nature, extent, ownership, and sale of the Collateral, including cattle.

**State Court Lawsuit**

44.     On or about July 1, 2025, the Bank filed a Complaint against Borrowers in the District Court of Scotts Bluff County (the "State Court").

45.     On October 28, 2025, Perkins filed his first Chapter 12 voluntary petition for bankruptcy in the U.S. Bankruptcy Court for the District of Nebraska.

46.     As a result, the Bank's claims against Perkins were stayed pursuant to 11 U.S.C. § 362.

47.     On or about December 3, 2025, the Bank and Perkins Agribusiness filed and submitted with the State Court a Stipulation Regarding Entry of Judgment as to Perkins Agribusiness only (the "Stipulation").

48.     Consistent with the Stipulation, on December 3, 2025, the State Court entered a Consent Judgment in favor of the Bank against Perkins Agribusiness for the entire principal and interest amount under the Note that was then due and owing, which was $2 million principal, plus $313,331.88 in accrued prejudgment interest (the "Consent Judgment").

49.     On December 11, 2025, the Bankruptcy Court dismissed Perkins' first bankruptcy due to the failure to timely file the required schedules and or statement of financial.

50.     On January 5, 2026, the Bank filed another Motion for Summary Judgment with the State Court as it relates to Perkins, in his individual capacity.

9

51.     On or about on February 17, 2026, Perkins filed his second, operative Voluntary Petition under Chapter 12 of the Bankruptcy Code.

## CLAIM FOR RELIEF

**Materially False Statements in Writing – Violation of 11 U.S.C. § 523(a)(2)(B)**

52.     The Bank incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

53.     Bankruptcy Code § 523(a)(2)(B) provides in relevant part, that:

(a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt---

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by--

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

54.     At the time of or after entering into the Loan Agreement, Note, and Security Agreement, Perkins made numerous false representations and statements about his financial condition, specifically Perkins misrepresented his and or Perkins Agribusiness' ownership in cattle that served as the Collateral for the Note.

55. Perkins' Financial Statements and Borrowing Base Certificates include materially false statements and representations regarding Perkins and Perkins' Agribusiness financial condition.

Perkins caused to be made or published false statements and representations in the Financial Statements and Borrowing Base Certificates he provided to the Bank with the intent to deceive the Bank about his financial condition.

56. Perkins knew that these statements and representations were false and made them for the purpose of deceiving the Bank.

57. Perkins is still liable for the original principal amount of two million dollars ($2,000,000.00) under the Loan Agreement and Note, with interest accruing on such principal at a variable rate.

58. The Bank reasonably and justifiably relied on the false statements and representations made by Perkins in order to extend Perkins' loan with the bank, renew Perkins' loan with the Bank, provide services to Perkins, and/or otherwise refinance Perkins' loan with the Bank.

59. As a direct and proximate cause of Perkins' false statements and representations, the Bank has suffered damages.

WHEREFORE, the Bank requests request the Court enter an order (a) determining that the debt owed by Debtor to the Bank is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B); (b) awarding the Bank its costs and expenses, including reasonable attorneys' fees to the extent allowed by law and the costs of this adversary proceeding; and (c) awarding the Bank such other and further relief as may be just and proper.

Dated: May 15, 2026

First Interstate Bank, Plaintiff,


By: */s/ Kristin Krueger*____
    Kristin Krueger, #23919
    Hunter J. Belcastro, #28406
    KOLEY JESSEN P.C., L.L.O.
    One Pacific Place, Suite 800
    1125 South 103rd Street
    Omaha, NE  68124-1079
    (402) 390-9500
    (402) 390-9005 (facsimile)
    Kristin.Krueger@koleyjessen.com
    Hunter.Belcastro@koleyjessen.com

*Attorneys for Plaintiff.*